## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUTHER HUGUELET, individually and on behalf of all others similarly situated,<br><br>                 Plaintiff,<br><br>   v.<br><br>MAXIM INC. and BIGLARI HOLDINGS INC.,<br><br>                Defendants. | Civil Action No.: 19-cv-4452<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Luther Huguelet ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Between May 15, 2016 and July 30, 2016, defendants Maxim Inc. and Biglari Holdings, Inc. (collectively hereinafter, "Maxim") rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Luther Huguelet's *Maxim* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, non-profit organizations, and other third-party companies. As a result, Mr. Huguelet has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Mr. Huguelet's Personal Reading Information (defined below) between May 15, 2016 and July 30, 2016, Maxim violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989)

(the "PPPA").[1]

2.      Documented evidence confirms these facts.  For example, a list broker, NextMark, offers to provide renters access to the Personal Reading Information of 68,557 active U.S. subscribers to *Maxim* magazine (as of June 30, 2018), at a base price of "$110.00/M [per thousand]," (*i.e.*, 11 cents apiece), as shown in the following screenshot of the "Maxim Magazine Mailing List" page on NextMark's website:

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods*., 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

# Maxim Magazine Mailing List

Maxim became the world's largest men's lifestyle brand by offering a rich mix of unapologetically curated content for the modern man - indulging the reader in his interests, passions and achievements. With one of the largest subscriber files in the men's magazine category, every issue of Maxim includes the sexiest women, reviews of the latest and greatest styles, trends, and gadgets; plus interviews with celebrities. Regular editorial includes the best of sports, gadgets, health and fitness, fashion, sex and humor.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 06/30/2018 |
|---|---|
| 68,071 TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 68,557 ACTIVE SUBSCRIBERS | $110.00/M |
| 12,367 6 MONTH SUBSCRIBERS | + $8.00/M |
| 27,756 12 MONTH SUBSCRIBERS | + $110.00/M |
| 29,321 ACTIVE DTP | + $10.00/M |
| 67,749 ACTIVE PAID | + $10.00/M |
| 12 MONTH EXPIRES | + $75.00/M |
| 726 ACTIVE CANADIAN SUBSCRIBERS | + $350.00/F |
| FUNDRAISER/NON-PROFIT | $75.00/M |
| CATALOG OFFERS | $85.00/M |
| FACEBOOK MATCH & TARGET | + $25.00/M |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |

| POPULARITY: | ===== 98 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | PUBLICATIONS, AGENT SOLD, DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA CANADA |
| GENDER: | 20% FEMALE 80% MALE |
| SPENDING: | $24.00 AVERAGE ORDER |

**DESCRIPTION**

Maxim became the world's largest men's lifestyle brand by offering a rich mix of unapologetically curated content for the modern man - indulging his interests, passions and achievements. With a reimagined design and focus that reeks of honest confidence and attitude, Maxim promises to seduce, entertain and continually surprise readers by breaking the mediocrity mold with a smart, often irreverent exploration of masculinity today.

**MAXIM**

Published by Maxim Inc., Maxim is the essential guide for today's active male consumer. With one of the largest subscriber files in the men's magazine category, every issue of Maxim includes the sexiest women, reviews of the latest and greatest styles, trends, and gadgets; plus interviews with celebrities. Regular editorial includes the best of sports, gadgets, health and fitness, fashion, sex and humor. This list is perfect for publishing, general merchandise, insurance, lifestyle and specialty market offers.

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $17.00/M |
| 3 MONTH HOTLINE | $12.00/M |
| 6 MONTH HOTLINE | $8.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |
| FACEBOOK MATCH & TARGET | $25.00/M |
| GENDER | $12.00/M |
| PAID | $10.00/M |
| SOURCE | $10.00/M |
| STATE, SCF/ZIP | $10.00/M |
| ADDRESSING | |
| KEY CODING | $3.00/M |
| E-MAIL | $75.00/F |
| FTP | $75.00/F |
| ZIP SETUP FEE | $50.00/F |

**RELATED LISTS**

GQ - GENTLEMEN'S QUARTERLY MAGAZINE
WILAND PUBLISHING/SUBSCRIBER DATABASE
PLAYBOY MAGAZINE - U.S. SUBSCRIBERS
ESQUIRE
MEN'S HEALTH MASTERFILE

*See* Complaint **Exhibit A** hereto.

3.      Renters are able to access the Personal Reading Information of *Maxim* magazine subscribers based on, but not limited to, their "gender" as well as other matching and targeting

data provided by Facebook. *Id.*

4.     By renting, exchanging, or otherwise disclosing the Personal Reading

Information of its Michigan-based subscribers between May 15, 2016 and July 30, 2016, Maxim

violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the
> business of selling at retail, renting, or lending books or other
> written materials ... shall not disclose to any person, other than the
> customer, a record or information concerning the purchase ... of
> those materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

5.     Accordingly, Plaintiff brings this Class Action Complaint against Maxim for its

intentional and unlawful disclosure of its customers' Personal Reading Information in violation

of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

6.     To supplement its revenues, Maxim rents, exchanges, or otherwise discloses its

customers' personal information—including their full names, the fact that they subscribe to

*Maxim* magazine, and home addresses (collectively "Personal Reading Information"), as well as

myriad other personal, lifestyle, and demographic information such as gender, age, and other

matching and targeting data provided by Facebook—to data aggregators, data appenders, data

cooperatives, and other third parties without the written consent of its customers.

7.     By renting, exchanging, or otherwise disclosing – rather than selling – its

customers' Personal Reading Information, Maxim is able to disclose the information time and

time again to countless third parties.

8.     Maxim's disclosure of Personal Reading Information, and other personal,

demographic, and lifestyle information is not only unlawful, but also dangerous because it allows

for the targeting of particularly vulnerable members of society.  In fact, almost any organization

can rent a customer list from Maxim that contains a number of categories of detailed subscriber

information.  For example, almost any organization could rent a list with the names and

addresses of all *Maxim* customers who are female and live in Michigan; such a list would cost

approximately $134.00 per thousand names listed.

9.      While Maxim profits handsomely from the unauthorized rental, exchange,

and/or disclosure of its customers' Personal Reading Information and other personal information,

it does so at the expense of its customers' privacy and statutory rights because Maxim does not

obtain its customers' written consent prior to disclosing their Personal Reading Information.

## PARTIES

10.     Plaintiff Luther Huguelet is a natural person and citizen of Harrison, Michigan.

Plaintiff Huguelet is a subscriber to *Maxim* magazine, and was a subscriber between May 15,

2016 and July 30, 2016 as well.  *Maxim* magazine is published by Maxim.  While residing in, a

citizen of, and present in Michigan, Plaintiff Huguelet purchased his subscription to *Maxim*

magazine directly from Maxim.  Prior to and at the time he subscribed to *Maxim*, Maxim did not

notify Plaintiff Huguelet that it discloses the Personal Reading Information of its customers, and

Plaintiff Huguelet has never authorized Maxim to do so.  Furthermore, Plaintiff Huguelet was

never provided any written notice that Maxim rents, exchanges, or otherwise discloses its

customers' Personal Reading Information, or any means of opting out.  Since subscribing to

*Maxim*, and between May 15, 2016 and July 30, 2016, Maxim disclosed, without consent or prior

notice, Plaintiff Huguelet's Personal Reading Information to data aggregators, data appenders,

and/or data cooperatives, who then supplement that information with data from their own files.

Moreover, during that same period, Maxim rented or exchanged mailing lists containing Plaintiff

Huguelet's Personal Reading Information to third parties seeking to contact Maxim subscribers,

without first obtaining Plaintiff Huguelet's written consent or even giving him prior notice of the

rentals, exchanges, and/or other disclosures.  Because Maxim rented, exchanged, and/or

otherwise disclosed his Personal Reading Information, Plaintiff Huguelet now receives junk mail

from various organizations that do not offer products or services to consumers.  These

unwarranted mailings waste Plaintiff Huguelet's time, money, and resources.  These harassing

junk mailings received by Plaintiff Huguelet' are attributable to Maxim's unauthorized rental,

exchange, and/or disclosure of his Personal Reading Information.  Because Plaintiff Huguelet is

entitled by law to privacy in his Personal Reading Information, and because he paid money for

his subscription, Maxim's disclosure of his Personal Reading Information deprived Plaintiff

Huguelet of the full set of benefits to which he was entitled as a part of his *Maxim* subscription,

thereby causing him economic harm.  Accordingly, what Plaintiff Huguelet received (a

subscription without statutory privacy protections) was less valuable than what he paid for (a

subscription with accompanying statutory privacy protections), and he would not have been

willing to pay as much, if at all, for his *Maxim* subscription had he known that Maxim would

disclose his Personal Reading Information.

11.     Defendant Maxim Inc. is a Delaware corporation with its principal place of

business at 415 Madison Ave, 3rd Floor, New York, New York 10017.  Maxim Inc. does

business throughout Michigan and the entire United States.

12.     Defendant Biglari Holdings, Inc. is a Delaware corporation with its principal

place of business at 17802 IH 10 West, Suite 400, San Antonio, Texas 78257.  Biglari Holdings

Inc. does business throughout Michigan and the entire United States.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from each of the Defendants.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     The Court has personal jurisdiction over Defendants because Defendants conduct substantial business within New York, such that Defendants have significant, continuous, and pervasive contacts within the State of New York.  Additionally, Defendant Maxim Inc.'s principal place of business is in New York, New York.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Defendant Maxim Inc.'s principal place of business is within this District.

## FACTUAL BACKGROUND

### Michigan's Preservation of Personal Privacy Act

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

7

18.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

19.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

22.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that

8

matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No.

5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

23.      Despite the fact that thousands of Michigan residents subscribe to Maxim's

publications, Maxim disregarded its legal responsibility by systematically violating the PPPA.

### *The Personal Information Market: Consumers' Personal Information Has Real Value*

24.      In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle

remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting

and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . .

[and] individuals are concerned about being defined by the existing data on themselves."[2]

25.      More than a decade later, Commissioner Swindle's comments ring truer than

ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per

year online advertising industry in the United States.[3]

26.      The FTC has also recognized that consumer data possesses inherent monetary

value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount
> of information collected by businesses, or why their information
> may be commercially valuable. Data is currency. The larger the
> data set, the greater potential for analysis—and profit.[4]

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at
8:15-11:16, *available at*
https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-
merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited Jan. 29, 2019).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available
at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Jan. 29, 2019)
(emphasis added).

27.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

28.     The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

29.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

30.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

---

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012),

31.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

32.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Maxim share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

33.     Information disclosures like Maxim's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent

---

http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Jan. 29, 2019).

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Jan. 29, 2019).

[12] *Id.*

telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

34.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Maxim's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

35.     Maxim is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

***Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases***

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc.

---

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

[14] *See id.*

showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

39.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

40.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

41.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

42.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Maxim Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

43.     Maxim maintains a vast digital database comprised of its customers' Personal Reading Information.  Maxim discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each Maxim customer, including gender and other matching and targeting data provided by Facebook.  (*See, e.g.*, **Exhibit A**).

44.     Maxim then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, marketing companies, and organizations soliciting donations (*See id.*).

45.     Maxim also discloses its customers' Personal Reading Information to data cooperatives, who in turn, give Maxim access to their own mailing list databases.

46.     As a result of Maxim's data compiling and sharing practices, companies can

---

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

purchase and/or obtain mailing lists from Maxim that identify Maxim customers by their most intimate details.  Maxim's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Maxim will rent—to almost any organization willing to pay for it—a list with the names and addresses of all persons who are female, reside in Michigan, and subscribe to *Maxim*; such a list would cost approximately $134.00 per thousand names listed.

47.     Maxim does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

48.     Consumers can sign up for Maxim subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Maxim never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Maxim uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

49.     As a result, Maxim disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

50.     By and through these actions, Maxim has intentionally disclosed to third parties its Michigan customers' Personal Reading Information without consent, in direct violation of the

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

PPPA.

<h2 style="text-align:center"><u>CLASS ACTION ALLEGATIONS</u></h2>

51.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point in time between May 15, 2016 and July 30, 2016, had their Personal Reading Information disclosed to third parties by Maxim without consent (the "Class").  Excluded from the Class is any entity in which the Defendants have a controlling interest, as well as all officers and directors of Defendants.

52.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

53.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Maxim is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether Maxim obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Maxim's disclosures of Plaintiff's and the Class's Personal Reading Information violated the PPPA; and (d) whether Maxim's rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

54.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' disclosure of Plaintiff's and the Class's Personal Reading

Information.

55.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

56.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

<u>**COUNT I**</u>
**Violation of the Preservation of Personal Privacy Act**
**(PPPA § 2)**

57.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

58.     Plaintiff brings this claim individually and on behalf of members of the Class against Maxim (defined herein to include both Maxim Inc. and Biglari Holdings Inc.).

59.     As a magazine publisher that sells subscriptions to consumers, Maxim is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

60.     By purchasing a subscription to *Maxim* magazine, Plaintiff purchased written materials directly from Maxim.  *See* PPPA § 2.

61.     Because Plaintiff purchased written materials directly from Maxim, he is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

62.     At various times between May 15, 2016 and July 30, 2016, Maxim disclosed Plaintiff's Personal Reading Information, which identified him as a *Maxim* customer, in at least three ways.

63.     First, Maxim disclosed mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Maxim.

64.     Second, Maxim disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave Maxim access to their own mailing list databases.

65.     Third, Maxim rented and/or exchanged its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work.

66.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Maxim was able to increase its profits gained from the mailing list rentals and/or exchanges.

67.     By renting, exchanging, or otherwise disclosing its customer lists, between May 15, 2016 and July 30, 2016, Maxim disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from Maxim.  *See* PPPA § 2.

68.     The information Maxim disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed *Maxim*.  Accordingly, the records or information disclosed by Maxim indicate Plaintiff's identity.  *See* PPPA § 2.

69.     Plaintiff and the members of the Class never consented to Maxim disclosing their Personal Reading Information to anyone.

70.     Worse yet, Plaintiff and the members of the Class did not receive notice before Maxim disclosed their Personal Reading Information to third parties.

71.     On information and belief, Maxim's disclosures of Plaintiff's and the Class's Personal Reading Information between May 15, 2016 and July 30, 2016 were not made pursuant to a court order, search warrant, or grand jury subpoena.

72.     Maxim's disclosures of Plaintiff's and the Class's Personal Reading Information between May 15, 2016 and July 30, 2016 were not made to collect payment for their subscriptions.

73.     Maxim's disclosures of Plaintiff's Personal Reading Information between May 15, 2016 and July 30, 2016 were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work—all in order to increase Maxim's revenue.  Accordingly, Maxim's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

74.     By disclosing Plaintiff's Personal Reading Information between May 15, 2016

and July 30, 2016, Maxim violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* PPPA § 2.

75.     Additionally, because Plaintiff and the members of the Class paid for their subscriptions to Maxim's publications, and Maxim was obligated to comply with the PPPA, Maxim's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Maxim's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

76.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

77.     Accordingly, had Plaintiff been adequately informed of Maxim's disclosure practices, he would not have been willing to purchase his *Maxim* subscription at the price charged, if at all.  Thus, Maxim's unlawful disclosures caused Plaintiff economic harm.

78.     Maxim's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third-party print advertisements.

79.     As a result of Maxim's unlawful disclosure of their Personal Reading Information between May 15, 2016 and July 30, 2016, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of himself and the Class, Plaintiff seeks:  (1) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
### Unjust Enrichment

80.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

81.     Plaintiff brings this claim individually and on behalf of members of the Class against Maxim (defined herein to include both Maxim Inc. and Biglari Holdings Inc.).

82.     Plaintiff and the Class members conferred benefits on Maxim by providing Maxim with their Personal Reading Information and paying Maxim for their magazine publication subscriptions.

83.     Maxim received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to Maxim's publications.

84.     Because Maxim received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Maxim has employees and/or agents handling customer accounts and billing as well as customer data, Maxim appreciates or has knowledge of such benefits.

85.     Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

86.     Under principles of equity and good conscience, because Maxim failed to comply with the PPPA between May 15, 2016 and July 30, 2016, Maxim should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information between May 15, 2016 and July 30, 2016.

87.     Moreover, Maxim should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal

Reading Information between May 15, 2016 and July 30, 2016.

88.    Plaintiff and the other Class members have suffered actual damages as a result of Maxim's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

89.    Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Maxim's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

90.    Further, a portion of the purchase price of each Maxim magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA. Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

91.    To prevent inequity, Maxim should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Maxim's rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information between May 15, 2016 and July 30, 2016.

92.    Accordingly, Plaintiff and the Class members seek an order declaring that Maxim's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Maxim through

its rental, exchange, and/or other disclosure, between May 15, 2016 and July 30, 2016, of

Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

a judgment against Defendants as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules
      of Civil Procedure and naming Plaintiff as representative of the Class
      and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order declaring that Defendants' conduct as described herein
      violates the Preservation of Personal Privacy Act, PPPA;

C.    For an order finding in favor of Plaintiff and the Class on all counts
      asserted herein;

D.    For an award of actual damages or $5,000, whichever is greater, to
      Plaintiff and each Class member, as provided by the Preservation of
      Personal Privacy Act, PPPA § 5(a);

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary
      relief;

G.    For an order awarding Plaintiff and the Class their reasonable
      attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  May 15, 2019                    Respectfully submitted,

                                        By:_____*/s Philip L. Fraietta*_____
                                                Philip L. Fraietta

                                        Joseph I. Marchese
                                        jmarchese@bursor.com
                                        Philip L. Fraietta
                                        pfraietta@bursor.com
                                        BURSOR & FISHER, P.A.
                                        888 Seventh Avenue
                                        New York, New York 10019
                                        Tel: 646.837.7150
                                        Fax: 212.989.9163

                                        Frank S. Hedin*
                                        fhedin@hedinhall.com
                                        David W. Hall*
                                        dhall@hedinhall.com
                                        HEDIN HALL LLP
                                        1395 Brickell Avenue, Suite 900
                                        Miami, Florida 33131
                                        Tel: 305.357.2107
                                        Fax: 305.200.8801

                                        **Pro Hac Vice* Forthcoming

                                        *Counsel for Plaintiff Luther Huguelet*