**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATRICK HUFFORD and JOHN WISBISKI, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br> v.<br><br>MAXIM INC.,<br><br>         Defendant. | Civil Action No.: 19-cv-4452-ALC-RWL<br><br>**FIRST AMENDED<br>CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Patrick Hufford and John Wisbiski ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## INTRODUCTION

1.  Between May 15, 2016 and July 30, 2016, defendant Maxim Inc. ("Maxim") rented, exchanged, and/or otherwise disclosed personal information about Plaintiffs' *Maxim* magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, non-profit organizations, and other third-party companies. As a result, Plaintiffs have received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Personal Reading Information (defined below) between May 15, 2016 and July 30, 2016, Maxim violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich.

1989) (the "PPPA").[1]

2.      Documented evidence confirms these facts.  For example, a list broker, NextMark, offers to provide renters access to the Personal Reading Information of 68,557 active U.S. subscribers to *Maxim* magazine (as of June 30, 2018), at a base price of "$110.00/M [per thousand]," (*i.e.*, 11 cents apiece), as shown in the following screenshot of the "Maxim Magazine Mailing List" page on NextMark's website:

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

# Maxim Magazine Mailing List

Maxim became the world's largest men's lifestyle brand by offering a rich mix of unapologetically curated content for the modern man - indulging the reader in his interests, passions and achievements. With one of the largest subscriber files in the men's magazine category, every issue of Maxim includes the sexiest women, reviews of the latest and greatest styles, trends, and gadgets; plus interviews with celebrities. Regular editorial includes the best of sports, gadgets, health and fitness, fashion, sex and humor.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 06/30/2018 | |
|---|---|---|
| 68,071 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 68,557 | ACTIVE SUBSCRIBERS | $110.00/M |
| 12,367 | 6 MONTH SUBSCRIBERS | + $8.00/M |
| 27,756 | 12 MONTH SUBSCRIBERS | + $110.00/M |
| 29,321 | ACTIVE DTP | + $10.00/M |
| 67,749 | ACTIVE PAID | + $10.00/M |
| | 12 MONTH EXPIRES | + $75.00/M |
| 726 | ACTIVE CANADIAN SUBSCRIBERS | + $350.00/F |
| | FUNDRAISER/NON-PROFIT | $75.00/M |
| | CATALOG OFFERS | $85.00/M |
| | FACEBOOK MATCH & TARGET | + $25.00/M |
| | FACEBOOK DIGITAL DISPLAY | $55.00/M |

| | |
|---|---|
| POPULARITY: | ▪▪▪▪▪ 98 |
| MARKET: | CONSUMER |
| CHANNELS: | 🖼 |
| SOURCE: | PUBLICATIONS, AGENT SOLD, DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA CANADA |
| GENDER: | 20% FEMALE 80% MALE |
| SPENDING: | $24.00 AVERAGE ORDER |

**DESCRIPTION**

Maxim became the world's largest men's lifestyle brand by offering a rich mix of unapologetically curated content for the modern man - indulging the reader in his interests, passions and achievements. With a reimagined design and focus that reeks of honest confidence and attitude, Maxim promises to seduce, entertain and continually surprise readers by breaking the mediocrity mold with a smart, often irreverent exploration of masculinity today.

**MAXIM**

Published by Maxim Inc., Maxim is the essential guide for today's active male consumer. With one of the largest subscriber files in the men's magazine category, every issue of Maxim includes the sexiest women, reviews of the latest and greatest styles, trends, and gadgets; plus interviews with celebrities. Regular editorial includes the best of sports, gadgets, health and fitness, fashion, sex and humor. This list is perfect for publishing, general merchandise, insurance, lifestyle and specialty market offers.

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $17.00/M |
| 3 MONTH HOTLINE | $12.00/M |
| 6 MONTH HOTLINE | $8.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |
| FACEBOOK MATCH & TARGET | $25.00/M |
| GENDER | $12.00/M |
| PAID | $10.00/M |
| SOURCE | $10.00/M |
| STATE, SCF/ZIP | $10.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $3.00/M |
| E-MAIL | $75.00/F |
| FTP | $75.00/F |
| ZIP SETUP FEE | $50.00/F |

| RELATED LISTS |
|---|
| GQ - GENTLEMEN'S QUARTERLY MAGAZINE |
| WILAND PUBLISHING/SUBSCRIBER DATABASE |
| PLAYBOY MAGAZINE - U.S. SUBSCRIBERS |
| ESQUIRE |
| MEN'S HEALTH MASTERFILE |

*See* Complaint **Exhibit A** hereto.

3.       Renters are able to access the Personal Reading Information of *Maxim* magazine

subscribers based on, but not limited to, their "gender" as well as other matching and targeting data provided by Facebook.  *Id.*

4.      By renting, exchanging, or otherwise disclosing the Personal Reading Information of its Michigan-based subscribers between May 15, 2016 and July 30, 2016, Maxim violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

5.      Accordingly, Plaintiffs bring this Class Action Complaint against Maxim for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

6.      To supplement its revenues, Maxim rents, exchanges, or otherwise discloses its customers' personal information—including their full names, the fact that they subscribe to *Maxim* magazine, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, and other matching and targeting data provided by Facebook—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers.

7.      By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Personal Reading Information, Maxim is able to disclose the information time and time again to countless third parties.

8.      Maxim's disclosure of Personal Reading Information, and other personal,

4

demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, almost any organization can rent a customer list from Maxim that contains a number of categories of detailed subscriber information.  For example, almost any organization could rent a list with the names and addresses of all *Maxim* customers who are female and live in Michigan; such a list would cost approximately $134.00 per thousand names listed.

9.     While Maxim profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because Maxim does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## **PARTIES**

10.     Plaintiff Patrick Hufford is a natural person and citizen of Yale, Michigan. Plaintiff Hufford was a subscriber to *Maxim* magazine.  *Maxim* magazine is published by Maxim.  While residing in, a citizen of, and present in Michigan, Plaintiff Hufford purchased his subscription to *Maxim* magazine directly from Maxim.  Prior to and at the time he subscribed to *Maxim*, Maxim did not notify Plaintiff Hufford that it discloses the Personal Reading Information of its customers, and Plaintiff Hufford has never authorized Maxim to do so. Furthermore, Plaintiff Hufford was never provided any written notice that Maxim rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Maxim*, and between May 15, 2016 and July 30, 2016, Maxim disclosed, without consent or prior notice, Plaintiff Hufford's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, Maxim rented or exchanged mailing lists containing Plaintiff Hufford's Personal Reading Information to third

5

parties seeking to contact Maxim subscribers, without first obtaining Plaintiff Hufford's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures. Because Maxim rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Hufford now receives junk mail from various organizations that do not offer products or services to consumers. These unwarranted mailings waste Plaintiff Hufford's time, money, and resources. These harassing junk mailings received by Plaintiff Hufford are attributable to Maxim's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information. Because Plaintiff Hufford is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Maxim's disclosure of his Personal Reading Information deprived Plaintiff Hufford of the full set of benefits to which he was entitled as a part of his *Maxim* subscription, thereby causing him economic harm. Accordingly, what Plaintiff Hufford received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Maxim* subscription had he known that Maxim would disclose his Personal Reading Information.

11.     Plaintiff John Wisbiski is a natural person and citizen of Warren, Michigan. Plaintiff Wisbiski was a subscriber to *Maxim* magazine. *Maxim* magazine is published by Maxim. While residing in, a citizen of, and present in Michigan, Plaintiff Wisbiski purchased his subscription to *Maxim* magazine directly from Maxim. Prior to and at the time he subscribed to *Maxim*, Maxim did not notify Plaintiff Wisbiski that it discloses the Personal Reading Information of its customers, and Plaintiff Wisbiski has never authorized Maxim to do so. Furthermore, Plaintiff Wisbiski was never provided any written notice that Maxim rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of

6

opting out.  Since subscribing to *Maxim*, and between May 15, 2016 and July 30, 2016, Maxim disclosed, without consent or prior notice, Plaintiff Wisbiski's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, Maxim rented or exchanged mailing lists containing Plaintiff Wisbiski's Personal Reading Information to third parties seeking to contact Maxim subscribers, without first obtaining Plaintiff Wisbiski's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures. Because Maxim rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Wisbiski now receives junk mail from various organizations that do not offer products or services to consumers.  These unwarranted mailings waste Plaintiff Wisbiski's time, money, and resources.  These harassing junk mailings received by Plaintiff Wisbiski are attributable to Maxim's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information.  Because Plaintiff Wisbiski is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Maxim's disclosure of his Personal Reading Information deprived Plaintiff Wisbiski of the full set of benefits to which he was entitled as a part of his *Maxim* subscription, thereby causing him economic harm.  Accordingly, what Plaintiff Wisbiski received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Maxim* subscription had he known that Maxim would disclose his Personal Reading Information.

12.     Defendant Maxim Inc. is a Delaware corporation with its principal place of business at 415 Madison Ave, 3rd Floor, New York, New York 10017.  Maxim Inc. does business throughout Michigan and the entire United States.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     The Court has personal jurisdiction over Defendant because Defendant's principal place of business is in New York, New York.  Additionally, Defendant conducts substantial business within New York, such that Defendant has significant, continuous, and pervasive contacts within the State of New York.

15.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is within this judicial District, Defendant does substantial business in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or

8

borrowing of certain materials," by prohibiting companies from disclosing certain types of

sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

18.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in
> the business of selling at retail, renting, or lending books or
> other written materials . . . *shall not disclose* to any person,
> other than the customer, a record or information concerning the
> purchase . . . of those materials by a customer that indicates the
> identity of the customer.

PPPA § 2 (emphasis added).

19.     Michigan's protection of reading information reflects the "gut feeling that

people ought to be able to read books and watch films without the whole world knowing," and

recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual

thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.

This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep.

No. 100–599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy

Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n

practical terms our right to privacy protects the choice of movies that we watch with our family in

our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec.

S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading materials are so

private:  "These activities are at the core of any definition of personhood.  They reveal our likes

and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions,

our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

22.     Michigan's passage of the PPPA also established as a matter of law "that a

9

person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit B**).

23.     Despite the fact that thousands of Michigan residents subscribe to Maxim's publications, Maxim disregarded its legal responsibility by systematically violating the PPPA.

### *The Personal Information Market: Consumers' Personal Information Has Real Value*

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

25.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the

---

[2] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited Jan. 29, 2019).

data set, the greater potential for analysis—and profit.[4]

27.     In fact, an entire industry exists while companies known as data aggregators

purchase, trade, and collect massive databases of information about consumers.  Data

aggregators then profit by selling this "extraordinarily intrusive" information in an open and

largely unregulated market.[5]

28.     The scope of data aggregators' knowledge about consumers is immense:  "If

you are an American adult, the odds are that [they] know[] things like your age, race, sex,

weight, height, marital status, education level, politics, buying habits, household health worries,

vacation dreams—and on and on."[6]

29.     Further, "[a]s use of the Internet has grown, the data broker industry has already

evolved to take advantage of the increasingly specific pieces of information about consumers

that are now available."[7]

30.     Recognizing the serious threat the data mining industry poses to consumers'

privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus

---

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Jan. 29, 2019) (emphasis added).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

31.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

32.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Maxim share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

33.     Information disclosures like Maxim's are particularly dangerous to the elderly.

---

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey  (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information  (last visited Jan. 29, 2019).

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams  (last visited Jan. 29, 2019).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Jan. 29, 2019).

"Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

34.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Maxim's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

35.     Maxim is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[12] *Id.*

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

[14] *See id.*

***Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases***

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

39.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

40.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

41.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

companies that adhere to more stringent policies of protecting their personal data.[18]

42.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Maxim Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

43.     Maxim maintains a vast digital database comprised of its customers' Personal Reading Information.  Maxim discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each Maxim customer, including gender and other matching and targeting data provided by Facebook.  (*See, e.g.*, **Exhibit A**).

44.     Maxim then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, marketing companies, and

---

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

organizations soliciting donations (*See id.*).

45.      Maxim also discloses its customers' Personal Reading Information to data cooperatives, who in turn, give Maxim access to their own mailing list databases.

46.      As a result of Maxim's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Maxim that identify Maxim customers by their most intimate details.  Maxim's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Maxim will rent—to almost any organization willing to pay for it—a list with the names and addresses of all persons who are female, reside in Michigan, and subscribe to *Maxim*; such a list would cost approximately $134.00 per thousand names listed.

47.      Maxim does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

48.      Consumers can sign up for Maxim subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Maxim never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Maxim uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

49.      As a result, Maxim disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3,

it.

50.     By and through these actions, Maxim has intentionally disclosed to third parties its Michigan customers' Personal Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs seek to represent a class defined as all Michigan residents who, at any point in time between May 15, 2016 and July 30, 2016, had their Personal Reading Information disclosed to third parties by Maxim without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, as well as all officers and directors of Defendant.

52.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

53.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Maxim is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether Maxim obtained consent before disclosing to third parties Plaintiffs' and the Class's Personal Reading Information; (c) whether Maxim's disclosures of Plaintiffs' and the Class's Personal Reading Information violated the PPPA; and (d) whether Maxim's rental, exchange, and/or disclosure of Plaintiffs' and the Class's Personal reading

---

2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

Information constitutes unjust enrichment.

54.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Personal Reading Information.

55.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

56.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Preservation of Personal Privacy Act
### (PPPA § 2)

57.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

58.     Plaintiffs bring this claim individually and on behalf of members of the Class against Maxim.

59.     As a magazine publisher that sells subscriptions to consumers, Maxim is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

60.     By purchasing a subscription to *Maxim* magazine, Plaintiffs purchased written materials directly from Maxim.  *See* PPPA § 2.

61.     Because Plaintiffs purchased written materials directly from Maxim, Plaintiffs are "customers" within the meaning of the PPPA.  *See* PPPA § 1.

62.     At various times between May 15, 2016 and July 30, 2016, Maxim disclosed Plaintiffs' Personal Reading Information, which identified them as *Maxim* customers, in at least three ways.

63.     First, Maxim disclosed mailing lists containing Plaintiffs' Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Maxim.

64.     Second, Maxim disclosed mailing lists containing Plaintiffs' Personal Reading Information to data cooperatives, who in turn gave Maxim access to their own mailing list databases.

65.     Third, Maxim rented and/or exchanged its mailing lists containing Plaintiffs'

19

Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work.

66.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Maxim was able to increase its profits gained from the mailing list rentals and/or exchanges.

67.     By renting, exchanging, or otherwise disclosing its customer lists, between May 15, 2016 and July 30, 2016, Maxim disclosed to persons other than Plaintiffs records or information concerning their purchases of written materials from Maxim.  *See* PPPA § 2.

68.     The information Maxim disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *Maxim*.  Accordingly, the records or information disclosed by Maxim indicate Plaintiffs' identities.  *See* PPPA § 2.

69.     Plaintiffs and the members of the Class never consented to Maxim disclosing their Personal Reading Information to anyone.

70.     Worse yet, Plaintiffs and the members of the Class did not receive notice before Maxim disclosed their Personal Reading Information to third parties.

71.     On information and belief, Maxim's disclosures of Plaintiffs' and the Class's Personal Reading Information between May 15, 2016 and July 30, 2016 were not made pursuant to a court order, search warrant, or grand jury subpoena.

72.     Maxim's disclosures of Plaintiffs' and the Class's Personal Reading Information between May 15, 2016 and July 30, 2016 were not made to collect payment for their subscriptions.

73.     Maxim's disclosures of Plaintiffs' Personal Reading Information between May

15, 2016 and July 30, 2016 were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work—all in order to increase Maxim's revenue.  Accordingly, Maxim's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

74.     By disclosing Plaintiffs' Personal Reading Information between May 15, 2016 and July 30, 2016, Maxim violated Plaintiffs' and Class Members' statutorily-protected right to privacy in their reading habits.  *See* PPPA § 2.

75.     Additionally, because Plaintiffs and the members of the Class paid for their subscriptions to Maxim's publications, and Maxim was obligated to comply with the PPPA, Maxim's unlawful disclosure of Plaintiffs' and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Maxim's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

76.     Likewise, because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

77.     Accordingly, had Plaintiffs been adequately informed of Maxim's disclosure practices, they would not have been willing to purchase their *Maxim* subscriptions at the price charged, if at all.  Thus, Maxim's unlawful disclosures caused Plaintiffs economic harm.

78.     Maxim's disclosure of Plaintiffs' Personal Reading Information to third parties

has also caused an influx of third-party print advertisements.

79. As a result of Maxim's unlawful disclosure of their Personal Reading Information between May 15, 2016 and July 30, 2016, Plaintiffs and the members of the Class have suffered privacy and economic injuries.  On behalf of themselves and the Class, Plaintiffs seek:  (1) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
## Unjust Enrichment

80. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

81. Plaintiffs bring this claim individually and on behalf of members of the Class against Maxim.

82. Plaintiffs and the Class members conferred benefits on Maxim by providing Maxim with their Personal Reading Information and paying Maxim for their magazine publication subscriptions.

83. Maxim received and retained the information and money belonging to Plaintiffs and the Class when Plaintiffs and the Class subscribed to Maxim's publications.

84. Because Maxim received and processed Plaintiffs' and the Class's subscription payments and Personal Reading Information, and because Maxim has employees and/or agents handling customer accounts and billing as well as customer data, Maxim appreciates or has knowledge of such benefits.

85. Under the PPPA, Plaintiffs and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

86. Under principles of equity and good conscience, because Maxim failed to comply

22

with the PPPA between May 15, 2016 and July 30, 2016, Maxim should not be allowed to retain

the full amount of money Plaintiffs and the Class paid for their subscriptions or the money it

received by renting, exchanging, and/or otherwise disclosing Plaintiffs' and the Class's Personal

Reading Information between May 15, 2016 and July 30, 2016.

87.     Moreover, Maxim should not be allowed to retain the monies it received as a

result of renting, exchanging, and/or otherwise disclosing Plaintiffs' and the Class's Personal

Reading Information between May 15, 2016 and July 30, 2016.

88.     Plaintiffs and the other Class members have suffered actual damages as a result of

Maxim's unlawful conduct in the form of the value Plaintiffs and the other Class members paid

for and ascribed to the confidentiality of their Personal Reading Information.  This amount is

tangible and will be calculated at trial.

89.     Additionally, Plaintiffs and the Class members have suffered actual damages

inasmuch as Maxim's failure to inform them that it would disclose their Personal Reading

Information caused them to purchase magazine publication subscriptions when they otherwise

would not have.

90.     Further, a portion of the purchase price of each Maxim magazine subscription

sold to Plaintiffs and the other Class members was intended to ensure the confidentiality of

Plaintiffs' and the other Class members' Personal Reading Information, as required by the PPPA.

Because Plaintiffs and the other Class members were denied services that they paid for and were

entitled to receive—i.e., confidentiality of their Personal Reading Information—and because

Plaintiffs and the Class would have commanded a discount to voluntarily forego those benefits,

they incurred actual monetary damages.

91.     To prevent inequity, Maxim should return to Plaintiffs and the Class the value

they ascribe to confidentiality of their Personal Reading Information and all money derived from

Maxim's rental, exchange, and/or other disclosure of Plaintiffs' and the Class's Personal Reading

Information between May 15, 2016 and July 30, 2016.

92.     Accordingly, Plaintiffs and the Class members seek an order declaring that

Maxim's conduct constitutes unjust enrichment, and awarding Plaintiffs and the Class restitution

in an amount to be calculated at trial equal to the amount of money obtained by Maxim through

its rental, exchange, and/or other disclosure, between May 15, 2016 and July 30, 2016, of

Plaintiffs' and the Class's Personal Reading Information.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek

a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, PPPA;

C.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.     For an award of actual damages or $5,000, whichever is greater, to each named Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  October 30, 2019                  Respectfully submitted,

                                          By:_____*/s Philip L. Fraietta*_____
                                                    Philip L. Fraietta

                                          Joseph I. Marchese
                                          jmarchese@bursor.com
                                          Philip L. Fraietta
                                          pfraietta@bursor.com
                                          BURSOR & FISHER, P.A.
                                          888 Seventh Avenue
                                          New York, New York 10019
                                          Tel: 646.837.7150
                                          Fax: 212.989.9163

                                          Frank S. Hedin
                                          fhedin@hedinhall.com
                                          David W. Hall
                                          dhall@hedinhall.com
                                          HEDIN HALL LLP
                                          1395 Brickell Avenue, Suite 1140
                                          Miami, Florida 33131
                                          Tel: 305.357.2107
                                          Fax: 305.200.8801


                                          *Counsel for Plaintiffs Patrick Hufford and John
                                          Wisbiski*

**EXHIBIT A**

① Start  ② Results  ③ Data Card  ④ Request  ⑤ Finished

# Maxim Magazine Mailing List

Maxim became the world's largest men's lifestyle brand by offering a rich mix of unapologetically curated content for the modern man - indulging the reader in his interests, passions and achievements. With one of the largest subscriber files in the men's magazine category, every issue of Maxim includes the sexiest women, reviews of the latest and greatest styles, trends, and gadgets; plus interviews with celebrities. Regular editorial includes the best of sports, gadgets, health and fitness, fashion, sex and humor.

[ Get Count ]  [ Get Pricing ]  [ Get More Information ]

| SEGMENTS | | *COUNTS THROUGH 06/30/2018* |
|---|---|---|
| 68,071 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 68,557 | ACTIVE SUBSCRIBERS | $110.00/M |
| 12,367 | 6 MONTH SUBSCRIBERS | + $8.00/M |
| 27,756 | 12 MONTH SUBSCRIBERS | + $110.00/M |
| 29,321 | ACTIVE DTP | + $10.00/M |
| 67,749 | ACTIVE PAID | + $10.00/M |
| | 12 MONTH EXPIRES | + $75.00/M |
| 726 | ACTIVE CANADIAN SUBSCRIBERS | + $350.00/F |
| | FUNDRAISER/NON-PROFIT | $75.00/M |
| | CATALOG OFFERS | $85.00/M |
| | FACEBOOK MATCH & TARGET | + $25.00/M |
| | FACEBOOK DIGITAL DISPLAY | $55.00/M |

| | |
|---|---|
| POPULARITY: ▪▪▪▪▪ 98 | |
| MARKET: | CONSUMER |
| CHANNELS: |  |
| SOURCE: | PUBLICATIONS, AGENT SOLD, DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA CANADA |
| GENDER: | 20% FEMALE 80% MALE |
| SPENDING: | $24.00 AVERAGE ORDER |

## DESCRIPTION

Maxim became the world's largest men's lifestyle brand by offering a rich mix of unapologetically curated content for the modern man - indulging the reader in his interests, passions and achievements. With a reimagined design and focus that reeks of honest confidence and attitude, Maxim promises to seduce, entertain and continually surprise readers by breaking the mediocrity mold with a smart, often irreverent exploration of masculinity today.

**MAXIM**

Published by Maxim Inc., Maxim is the essential guide for today's active male consumer. With one of the largest subscriber files in the men's magazine category, every issue of Maxim includes the sexiest women, reviews of the latest and greatest styles, trends, and gadgets; plus interviews with celebrities. Regular editorial includes the best of sports, gadgets, health and fitness, fashion, sex and humor. This list is perfect for publishing, general merchandise, insurance, lifestyle and specialty market offers.

Average Age 35

Average HHI $90K

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | $17.00/M |
| 3 MONTH HOTLINE | $12.00/M |
| 6 MONTH HOTLINE | $8.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |
| FACEBOOK MATCH & TARGET | $25.00/M |
| GENDER | $12.00/M |
| PAID | $10.00/M |
| SOURCE | $10.00/M |
| STATE, SCF/ZIP | $10.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $3.00/M |
| E-MAIL | $75.00/F |
| FTP | $75.00/F |
| ZIP SETUP FEE | $50.00/F |

## RELATED LISTS

- GQ - GENTLEMEN'S QUARTERLY MAGAZINE
- WILAND PUBLISHING/SUBSCRIBER DATABASE
- PLAYBOY MAGAZINE - U.S. SUBSCRIBERS
- ESQUIRE
- MEN'S HEALTH MASTERFILE
- CMC - THE CONSUMER MARKETING CONNECTION
- CONSUMER REPORTS
- DISABLED AMERICAN VETERANS ACTIVE DONORS
- DETAILS MAGAZINE
- PUBLISHERS CLEARING HOUSE BUYERS MASTERFILE

Homeowners 55%

Married 40%

Single 60%

Professional/Managerial 22%

Attended College 62%

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #339095 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)
- EXCHANGE IS NOT AVAILABLE
- REUSE IS AVAILABLE ON ORDERS OF 2,500
- CANCELLATION FEE AT $150.00/F

Get Count   Get Pricing   Get More Information

**EXHIBIT B**



**House
Legislative
Analysis
Section**

Washington Square Building, Suite 1025
Lansing, Michigan 48909
Phone: 517/373-6466

## PRIVACY: SALES, RENTALS OF VIDEOS, ETC.

**House Bill 5331** as enrolled
Second Analysis (1-20-89)

**Sponsor: Rep. David Honigman
House Committee: Judiciary
Senate Committee: Judiciary**

## THE APPARENT PROBLEM:

During the period when Congressional confirmation hearings were being held on the nomination of Robert Bork to the Supreme Court, a Washington weekly obtained and published a list of videotapes rented under Bork's wife's account. Many found this to be an unwarranted invasion of privacy, and the incident prompted the introduction in Congress of a bill to protect the privacy of those who rent or buy videotapes. Many in Michigan also believe that one's choice in videos, records, and books is nobody's business but one's own, and suggest the enactment of a statute to explicitly protect a consumer's privacy in buying and borrowing such items.

## THE CONTENT OF THE BILL:

The bill would create a new public act to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings. Except as otherwise provided by law, a retailer, lender, or renter of such items could not disclose information — such as selections made — on a particular customer to any person other than that customer. Such information could be disclosed with the customer's written permission, under a court order, to the extent reasonably necessary to collect past-due payment, for the exclusive purpose of marketing goods and services directly to the consumer, or under a search warrant. Violation of the bill would be a misdemeanor.

## FISCAL IMPLICATIONS:

The House Fiscal Agency says that the bill would have no fiscal implications. (1-18-89)

## ARGUMENTS:

### For:

The bill would recognize that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else, for that matter. The bill would complement the Library Privacy Act, which exempts library records on a person from disclosure under the Freedom of Information Act and prohibits disclosure absent a court order or the individual's consent.

**Response:** The bill, while laudable in its aims, may be unnecessary for libraries, which already are subject to civil penalties for violating the Library Privacy Act.

### Against:

The bill could offer more in the way of recourse for injured parties if it provided for civil damages as well as criminal misdemeanor penalties. Civil remedies not only offer a person recompense for harm done: they free a person from having to rely on a prosecutor's office to pursue a case.

H.B. 5331 (1-20-89)