**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PATRICK HUFFORD and JOHN WISBISKI,
individually and on behalf of all others similarly
situated,

                Plaintiffs,

    v.

MAXIM INC.,

                Defendant.

Civil Action No. 19-cv-04452-ALC-RWL

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**ATTORNEYS' FEES, COSTS, EXPENSES, AND SERVICE AWARDS**

Dated: September 25, 2020

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  jmarchese@bursor.com
       pfraietta@bursor.com

**HEDIN HALL LLP**
Frank S. Hedin*
1395 Brickell Avenue, Suite 1140
Miami, FL 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
Email: fhedin@hedinhall.com
*Admitted *Pro Hac Vice*

*Class Counsel*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................... 2

    A.    Michigan's Preservation Of Personal Privacy Act ............................... 2

    B.    Plaintiff's Allegations ......................................................................... 3

    C.    The Litigation And Work Performed To Benefit The Class .................. 3

SUMMARY OF THE SETTLEMENT ............................................................... 6

ARGUMENT ...................................................................................................... 6

I.     THE REQUESTED ATTORNEYS' FEES, COSTS, AND EXPENSES
      ARE REASONABLE AND SHOULD BE APPROVED .................................. 6

    A.    The Percentage Method Should Be Used To Calculate Fees ................... 9

    B.    The Reasonableness Of The Requested Fees Is Supported By This
        Circuit's Six-Factor *Goldberger* Test ................................................. 10

        1.    Time And Labor Expended By Counsel ...................................... 11

        2.    Magnitude And Complexity Of The Litigation ........................... 12

        3.    The Risk Of Litigation ............................................................... 13

        4.    The Quality Of Representation ................................................... 14

        5.    The Requested Fee In Relation To The Settlement ..................... 15

        6.    Public Policy Considerations ..................................................... 16

    C.    The Requested Attorneys' Fees Are Also Reasonable Under A
        Lodestar Cross-Check ........................................................................ 17

II.    THE REQUESTED SERVICE AWARDS REFLECT MR. HUFFORD'S
      AND MR. WISBISKI'S ACTIVE INVOLVEMENT IN THIS ACTION
      AND SHOULD BE APPROVED ................................................................ 18

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
522 F.3d 182 (2d Cir. 2008) ................................................................................ 8, 9

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*,
2002 WL 1315603 (S.D.N.Y. June 17, 2002) .......................................................... 7

*Blum v. Stenson*,
465 U.S. 886 (1984) ................................................................................................ 17

*Cassese v. Williams*,
503 F. App'x 55 (2d Cir. 2012) .............................................................................. 17

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................................ 8

*Clark v. Ecolab, Inc.*,
2010 WL 1948198 (S.D.N.Y. May 11, 2010) .......................................................... 8

*Coulter-Owens v. Time Inc.*,
695 F. App'x 117 (6th Cir. 2017) .......................................................................... 13

*Davis v. J.P. Morgan Chase & Co.*,
827 F. Supp. 2d 172 (W.D.N.Y. 2011) .................................................................... 8

*Dornberger v. Metro. Life Ins. Co.*,
203 F.R.D. 118 (S.D.N.Y. 2001) ........................................................................... 20

*Ebin v. Kangadis Food Inc.*,
297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) ............................................................. 14

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) ................................................................................................ 16

*GB ex rel NB v. Tuxedo Union Free School Dist.*,
894 F. Supp. 2d 415 (S.D.N.Y. 2012) ..................................................................... 7

*Goldberger v. Integrated Resources, Inc.*,
209 F.3d 43 (2d Cir. 2000) .............................................................................. passim

*Hayes v. Harmony Gold Min. Co.*,
2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ........................................................... 8

*Horton v. GameStop Corp.*,
380 F. Supp. 3d 679 (W.D. Mich. 2018) ......................................................... 3, 5, 6

*In re Beacon Assocs. Litig.*,
2013 WL 2450960 (S.D.N.Y. May 9, 2013) ............................................................ 9

*In re Citigroup Inc. Sec. Litig.*,
   965 F. Supp. 2d 369 (S.D.N.Y. 2013) ................................................................. 7

*In re Currency Conversion Fee Antirust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) ........................................................... 19

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. July 27, 2007) .................................................... 10

*In re Initial Public Offering Secs. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y.2009) ................................................................. 8

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................. 13, 15

*In re MetLife Demutalization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) .............................................................. 15

*In re Nasdaq Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................................... 12

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) .............................................................. 13

*Khait v. Whirlpool Corp.*,
   2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) .................................................... 8

*LeBlanc-Sternberg v. Fletcher*,
   143 F. 3d 748 (2d Cir. 1998) ............................................................................ 18

*Luciano v. Olsten Corp.*,
   109 F.3d 111 (2d Cir. 1997) .............................................................................. 17

*Luczak v. Nat'l Beverage Corp.*,
   2018 WL 9847842 (S.D. Fla. Oct. 12, 2018) .................................................... 15

*Massiah v. MetroPlus Health Plan, Inc.*,
   2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012) ............................................ 16, 19

*McDaniel v. County of Schenectady*,
   595 F.3d 411 (2d Cir. 2010) ............................................................................... 6

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ......................................................................................... 18

*Morris v. Affinity Health Plan, Inc.*,
   859 F. Supp. 2d 611 (S.D.N.Y. 2012) ........................................................ 7, 8, 9

*Parker v. Time Warner Entertainment Co., L.P.*,
   631 F. Supp. 2d 242 (E.D.N.Y. 2009) .............................................................. 17

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
   478 U.S. 546 (1986) ......................................................................................... 17

*Perdue v. Kenny A. ex rel. Winn*,
   559 U.S. 542 (2010) .................................................................................................. 9

*Reyes v. Altamarea Grp.*,
   2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) ................................................... 9, 19

*Shapiro v. JPMorgan Chase 7 Co.*,
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................................... 13, 16, 17

*Varljen v. H.J. Meyers & Co., Inc.*,
   2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ......................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ....................................................................... 7, 10, 17

*Willix v. Healthfirst, Inc.*,
   2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ........................................................... 8

## STATUTES

Michigan Preservation of Personal Privacy Act,
   M.C.L. §§ 445.1711-1715 ................................................................................. passim

## RULES

Fed. R. Civ. P. 12(c) ................................................................................................... 4

Fed. R. Civ. P. 23(h) ............................................................................................... 1, 6

Fed. R. Civ. P. 26 .............................................................................................. 4, 5, 11

## OTHER AUTHORITIES

S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) ....................................... 3

## INTRODUCTION

The Class Action Settlement between Plaintiffs Patrick Hufford and John Wisbiski, and Defendant Maxim Inc. ("Maxim"), if finally approved, resolves Plaintiffs' and the Class' claims against Maxim under Michigan's Preservation of Personal Privacy Act ("PPPA"), M.C.L. §§ 445.1711-1715.  The Settlement – preliminarily approved by this Court on August 13, 2020 – creates a $228,165 non-reversionary Settlement Fund, from which every Settlement Class Member (except for those who submit requests for exclusion from the Settlement) will automatically receive (i.e., without having to file a claim form) a *pro rata* cash payment of approximately $54.  Moreover, unlike prior PPPA settlements, this Settlement does not require Settlement Class Members to submit claim forms, and instead provides automatic payments to every class member who does not exclude him or herself.  Thus, unlike in past PPPA settlements where 80%-90% of the settlement class members did not submit claim forms and thus did not receive cash payments, in this case every non-excluded Settlement Class Member will receive a monetary payment by check upon final approval of the Settlement.

Obtaining this unprecedented relief did not come easily.  Plaintiffs shouldered significant risk, conducted a lengthy pre-filing investigation, engaged in both informal and formal discovery, and conducted months of contentious, arms'-length settlement negotiations.

In light of this exceptional result, Plaintiffs respectfully request pursuant to Federal Rule of Civil Procedure 23(h) that the Court approve attorneys' fees, costs, and expenses of one-third of the settlement fund, or $76,055, as well as service awards of $5,000 to each Plaintiff for their service as class representatives.  Although this Settlement provides for payments to Settlement Class Members that are on par with that of other PPPA settlements which required claim forms, the requested fee is an equal percentage to that approved by other courts in this District in PPPA class action settlements.  *See Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812-KMK, ECF

1

No. 87 (S.D.N.Y. Feb. 1, 2018) (awarding one-third of $8.225 million settlement fund resolving plaintiff's PPPA claim that paid approximately $41 per claimant).  And it is a lesser percentage than courts have approved in the Eastern District of Michigan.  *See Perlin v. Time Inc.*, No. 16-cv-10635-GCS, ECF No. 55 (E.D. Mich. Oct. 15, 2018) (awarding 40% of $7.4 million settlement fund resolving plaintiff's PPPA claim that paid between $25-$50 per claimant); *Kinder v. Meredith Corp.*, No. 14-cv-11284-TLL, ECF No. 81 (E.D. Mich. May 18, 2016) (awarding 35% of $7.5 million settlement fund resolving plaintiff's PPPA claim that paid approximately $50 per claimant).

For these reasons, and as explained further below, this Court should approve the requested fees, costs, expenses, and service awards.

## FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the PPPA, the litigation performed by Class Counsel for the Settlement Class' benefit, and the beneficial terms of the Settlement provide necessary context to the reasonableness of the requested fee and incentive award.

### A.    Michigan's Preservation Of Personal Privacy Act

The Michigan legislature passed the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings." First Amended Complaint (Dkt. 45) ("FAC") Ex. B.  As such, the PPPA provides that:

> a person, or an employee or agent of the person, engaged in the business of selling at retail . . . books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.

To enforce the statute, the PPPA authorizes civil actions and provides for the recovery of statutory damages in the amount of $5,000, plus costs and reasonable attorneys' fees.  *See id.*

§ 445.1715.  In May 2016, the Michigan legislature amended the statute.  *See* S.B. 490, 98th

Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at Am. PPPA § 1, *et seq*.).  The May 2016

amendment removed the statutory damages provision, among other changes.  However, the

amendment did not become effective until July 31, 2016.  Am. PPPA § 5(2).  Thus, "the

unamended [PPPA] applies to Plaintiff[s'] claims that accrued prior to July 31, 2016."  *Horton v.*

*GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

### B.  Plaintiffs' Allegations

Maxim is an international media company that publishes *Maxim* magazine.  *See* FAC ¶ 1.

Plaintiffs allege that between May 15, 2016 and July 30, 2016, Maxim disclosed information

related to its customers' magazine subscription histories and personal reading habits.  *Id.* ¶¶ 1-3,

6, 43-50.  To increase the value of such information, Plaintiffs allege that Maxim traded its

customers' protected reading information with certain third parties – including data mining

companies – in exchange for other demographic and lifestyle data that such companies have

already gathered (or "mined") on each subscriber.  *Id.* ¶¶ 6, 43-45.  Plaintiffs further allege that

Maxim thereafter "enhanced" its own customer profiles with this additional data, and then

allegedly disclosed the enhanced information to other unrelated third parties for a profit.  *Id.*

Plaintiffs further allege that no matter how consumers subscribe (*i.e.*, via postcard, over

the phone, or on Maxim's website), Maxim's customers never provided consent to disclose

information related to their magazine subscriptions to third parties.  *Id.* ¶¶ 6, 47-48.  This is

because – during the subscription process – Plaintiffs claim that customers are not required to

consent to any terms or policies informing them of Maxim's disclosure practices.  *Id.*

### C.  The Litigation And Work Performed To Benefit The Class

In December 2018, Class Counsel began a pre-suit investigation into Maxim's alleged

data-sharing practices.  *See* Declaration of Philip L. Fraietta In Support Of Plaintiffs' Motion For

Attorneys' Fees, Costs, Expenses, And Service Awards ("Fraietta Decl.") ¶ 4.  On May 15, 2019, Luther Huguelet filed a putative class action on behalf of Maxim subscribers alleging violations of the PPPA.  *See id.* ¶ 5 (citing Dkt. 1).  In response to the complaint, on August 23, 2019, Defendant filed an Answer denying the allegations generally and raising 13 affirmative defenses. *Id.* ¶ 6 (citing Dkt. 21).  Defendant also filed a letter requesting a pre-motion conference on an anticipated motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  *Id.* ¶ 7 (citing Dkt. 22).  On August 28, 2019, Mr. Huguelet filed a response to Defendant's letter. *Id.* ¶ 8 (citing Dkt. 25).

On September 18, 2019, the Parties conducted a discovery planning conference pursuant to Fed. R. Civ. P. 26(f).  *Id.* ¶ 9.  On September 24, 2019, the Parties filed a Joint Case Management Statement.  *Id.* ¶ 10 (citing Dkt. 28).  On October 1, 2019, the Court held an Initial Case Management Conference.  *Id.* ¶ 11.

On October 8, 2019, Mr. Huguelet filed a letter-motion for leave to file an amended complaint to add Plaintiffs Hufford and Wisbiski as named plaintiffs in this case.  *Id.* ¶ 12 (citing Dkt. 36).  On October 18, 2019, Defendant filed a letter brief in opposition to Mr. Huguelet's letter-motion to amend.  *Id.* ¶ 13 (citing Dkt. 42).  On October 24, 2019, the Court granted Mr. Huguelet's letter-motion for leave to file an amended complaint.  *Id.* ¶ 14 (citing Dkt. 43).  On October 25, 2019, the Court denied Defendant's request for a pre-motion conference concerning its anticipated motion for judgment on the pleadings without prejudice, in light of the order granting leave to amend.  *Id.* ¶ 15 (Dkt. 44).

On October 30, 2019, Plaintiffs filed a First Amended Complaint removing Mr. Huguelet as a Class Representative in this case.  *Id.* ¶ 16 (citing Dkt. 45).  On November 13, 2019, Defendant filed an Answer to Plaintiffs' First Amended Complaint denying the allegations generally and raising 13 affirmative defenses.  *Id.* ¶ 17 (Dkt. 48).  Thereafter, the Parties

commenced discovery, which included the exchange of written discovery and initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). *Id.* ¶¶ 18-21.

From the outset of the case, the Parties engaged in direct communication, and as part of their obligation under Fed. R. Civ. P. 26, discussed the prospect of resolution. *Id.* ¶ 22. To that end, on January 9, 2020, counsel for the Parties met in-person for approximately 1 hour to discuss potential resolution. *Id.* ¶ 23. During the meeting, counsel for the Parties exchanged informal discovery, including on issues such as the size and scope of the putative class, Defendant's purported notices of the disclosures, and details of Plaintiffs' subscription histories. *Id.* While counsel engaged in good faith negotiations, which at all times were at arms'-length, they failed to reach an agreement that day. *Id.* However, the Parties agreed that further negotiations would be beneficial, and agreed to continue their negotiations over the coming weeks. *Id.*

As part of the settlement negotiations, the Parties exchanged further informal discovery, including on issues such as the size and scope of the putative class. *Id.* ¶ 24. Given that the information exchanged would have been the same information produced in formal discovery related to issues of class certification and summary judgment, the Parties had sufficient information to assess the strengths and weaknesses of the claims and defenses. *Id.* ¶ 25.

Over the next few weeks, the Parties engaged in settlement negotiations and on February 18, 2020, after making substantial progress in those negotiations, filed a joint letter-motion requesting a 30-day stay of discovery to focus their efforts on settlement discussions. *Id.* ¶ 26 (citing Dkt. 56). The Court granted that request the same day. *Id.* (citing Dkt. 57).

On March 22, 2020, after engaging in continued negotiations, the Parties reached agreement on all material terms of a class action settlement and executed a term sheet. *Id.* ¶ 27. The next day, the Parties filed a joint letter to inform the Court that they had reached agreement

on all material terms.  *Id.* ¶ 27 (citing Dkt. 58).  Thereafter the parties drafted and executed the

Settlement Agreement and related documents which are submitted herewith.  *Id.* ¶ 30.  On

August 13, 2020, the Court granted preliminary approval to the Settlement.  *Id.* ¶ 32 (citing Dkt.

32).

**SUMMARY OF THE SETTLEMENT**

Class Counsel's efforts resulted in an excellent Settlement.  *Id.* ¶ 29.  The Settlement

provides an exceptional result by delivering immediate cash benefit to approximately 2,125

persons with a Michigan street address who subscribed directly to Maxim for receipt of a *Maxim*

magazine to be delivered to a Michigan street address between May 15, 2016 and July 30, 2016.

With a $228,165 non-reversionary Settlement Fund, each Class Member who does not exclude

him or herself from the Settlement should receive a *pro rata* cash payment of approximately $54.

*Id.*; *see also* Ex. A, Class Action Settlement Agreement ("Agreement") ¶¶ 1.34, 2.1.

**ARGUMENT**

**I.    THE REQUESTED ATTORNEYS' FEES, COSTS, AND EXPENSES ARE
       REASONABLE AND SHOULD BE APPROVED**

The requested fee award of $76,055, representing one-third of the cash common fund, is

reasonable and merits approval.  Under Federal Rule of Civil Procedure 23(h), courts may award

"reasonable attorney's fees and nontaxable costs that are authorized by law or the parties'

agreement."  Fed. R. Civ. P. 23(h).  Here, the Settlement Agreement between the Parties

provides that Class Counsel may petition the Court for an award of attorneys' fees, costs, and

expenses of up to one-third of the Settlement Fund.  Agreement ¶ 8.1.

In common-fund cases such as this one, courts in the Second Circuit apply one of two fee

calculation methods – the "percentage of the fund" method or the "lodestar" method.  *See*

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  The Court has

discretion in choosing which method to employ.  *See McDaniel v. County of Schenectady*, 595

6

F.3d 411, 419 (2d Cir. 2010) (holding that "the decision as to the appropriate method [is left] to

'the district court, which is intimately familiar with the nuances of the case'") (quoting

*Goldberger*, 209 F.3d at 48).  "The trend in this Circuit is to use the percentage of the fund

method to compensate attorneys in common fund cases like this one."  *Morris v. Affinity Health

Plan, Inc.*, 859 F. Supp. 2d 611, 622 (S.D.N.Y. 2012) (Carter, J.); *see also* Fraietta Decl. Ex. L,

1/31/18 *Trusted Media Brands* Final Approval Hearing Transcript ("*TMBI* Hearing Tr.") at 16-

18 (applying percentage of the fund method in a PPPA case).   In fact, the "trend" of using the

percentage of the fund method to compensate class counsel is now "firmly entrenched in the

jurisprudence of this Circuit."  *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 388

(S.D.N.Y. 2013).  As the Second Circuit has stated, the percentage method "directly aligns the

interests of the class and its counsel and provides a powerful incentive for the efficient

prosecution and early resolution of litigation."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396

F.3d 96, 121 (2d Cir. 2005).  "In contrast, the 'lodestar create[s] an unanticipated disincentive to

early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage

in gimlet-eyed review of line-item fee audits.'"  *Id.* (quoting *Baffa v. Donaldson Lufkin &

Jenrette Secs. Corp.*, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)).  Indeed, over a decade

ago, the Second Circuit described difficulties with the lodestar method:

> As so often happens with simple nostrums, experience with the
> lodestar method proved vexing.  Our district courts found it created
> a temptation for lawyers to run up the number of hours for which
> they could be paid.  For the same reason, the lodestar created an
> unanticipated disincentive to early settlements.  But the primary
> source of dissatisfaction was that it resurrected the ghost of
> Ebenezer Scrooge, compelling district courts to engage in a gimlet-
> eyed review of line-item fee audits.  There was an inevitable waste
> of judicial resources.

*Goldberger*, 209 F.3d at 48-49.  And as Judge Karas has noted, "courts in the Second Circuit no

longer use the 'lodestar' method for computing attorneys' fees" in fee-shifting cases.  *GB ex rel*

*NB v. Tuxedo Union Free School Dist.*, 894 F. Supp. 2d 415, 427 (S.D.N.Y. 2012) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008)); *see also TMBI* Hearing Tr. at 16:18-19 ("Now, the lodestar method is not supposed to be used for computing attorneys' fees.").

Moreover, "Class and Plaintiff[s]' Counsel's request for one-third of the Fund is reasonable and consistent with the norms of class litigation in this circuit."  *Morris*, 859 F. Supp. 2d at 623 (Carter, J.); *see TMBI* Hearing Tr. at 17:21-22 ("As I said, it's one-third.  That's typically approved by other courts."); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement fund) (Carter, J.); *Lyons v. Little Loan Serving LP*, Case No. 13-cv-00513-ALC-HBP, ECF No. 244 (Aug. 15, 2016) (awarding 33.33% of $4.121 million settlement); *Hayes v. Harmony Gold Min. Co.*, 2011 WL 6019219, at *1 (S.D.N.Y. Dec. 2, 2011) (awarding "attorneys' fees in the amount of one third" of a $9 million settlement fund), *aff'd* 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming fee award, and noting that "the prospect of a percentage fee award from a common fund settlement, as here, aligns the interests of class counsel with those of the class"); *In re Initial Public Offering Secs. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y.2009) (awarding one-third of the $510 million net settlement fund); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (awarding one-third of $42 million settlement fund); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *20 (S.D.N.Y. May 9, 2014) (awarding 33% of $15 million settlement fund); *Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *6–7 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million settlement fund); *Clark v. Ecolab, Inc.*, 2010 WL 1948198, at *8–9 (S.D.N.Y. May 11, 2010) (awarding one-third of $6 million settlement fund). Indeed, as courts in this Circuit have noted, fee requests for one-third of common funds represent what "reasonable, paying client[s] … typically pay … of their recoveries under private retainer

agreements." *Reyes v. Altamarea Grp.*, 2011 WL 4599822, at *8 (S.D.N.Y. Aug. 16, 2011)

(citing *Arbor Hill*, 522 F.3d 182).

### A.    The Percentage Method Should Be Used To Calculate Fees

As aforementioned, the "trend in this Circuit has been toward the use of a percentage of

recovery as the preferred method of calculating the award for class counsel in common fund

cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013); *see also*

*Morris*, 859 F. Supp. 2d at 622 (same).  Indeed, the percentage method has been used to calculate

fees for the ten other major PPPA class action settlements, including by courts in this District.

*See TMBI* Hearing Tr. at 16-18 (applying percentage method); *Ruppel v. Consumers Union of*

*United States, Inc.*, No. 16-cv-02444-KMK, ECF No. 111 (S.D.N.Y. Dec. 4, 2018) (same);

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, No. 15-cv-05671-NRB, ECF

No. 143 (S.D.N.Y. Mar. 6, 2019) (same); *Edwards v. Hearst Communications, Inc.*, No. 15-cv-

09279-AT-JLC (S.D.N.Y. Apr. 24, 2019) (same); *Halaburda v. Bauer Publ'g Co., L.P.*, No. 12-

cv-12831-GCS, ECF No. 68 (E.D. Mich. Jan. 6, 2015) (same); *Kinder v. Meredith Corp.*, No.

14-cv-11284-TLL, ECF No. 81 (E.D. Mich. May 18, 2016) (same); *Coulter-Owens v. Rodale,*

*Inc.*, No. 14-cv-12688-RHC, ECF No. 54 (E.D. Mich. Sept. 29, 2016) (same); *Moeller v.*

*American Media, Inc.*, No. 16-cv-11367-JEL, ECF No. 42 (E.D. Mich. Sept. 28, 2017) (same);

*Perlin v. Time Inc.*, No. 16-cv-10635-GCS, ECF No. 55 (E.D. Mich. Oct. 15, 2018) (same);

*Kokoszki v. Playboy Enterprises, Inc.*, No. 19-cv-10302-BAF-RSW, ECF No. 38 (E.D. Mich.

Aug. 19, 2020) (same).  In contrast, the lodestar approach is more often applied in federal fee-

shifting cases, particularly civil rights actions.  *See, e.g.*, *Perdue v. Kenny A. ex rel. Winn*, 559

U.S. 542, 551 (2010).  As Judge Cote has stated, the percentage method is preferred for several

reasons:

> First, it relieves the court of the cumbersome, enervating, and often
> surrealistic process of evaluating fee petitions.  Second, it

> decreases plaintiff lawyers' incentive to run up the number of
> billable hours for which they would be compensated by the
> lodestar method. And finally, it decreases the incentive to delay
> settlement because the fee for the plaintiffs' attorneys does not
> increase with delay.

*Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (internal

citations omitted); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL

2230177, at *16 (S.D.N.Y. July 27, 2007) ("From a public policy perspective, the percentage

method is the most efficient means of compensating the work of class action attorneys. It does

not waste judicial resources analyzing thousands of hours of work, where counsel obtained a

superior result.").

Under the circumstances of this case – wherein Class Counsel received an exceptional

result for the Settlement Class – the Second Circuit prefers the percentage method. *See Wal-

Mart Stores, Inc.*, 396 F.3d at 121 (noting that the percentage method "directly aligns the

interests of the class and its counsel and provides a powerful incentive for the efficient

prosecution and early resolution of litigation"). In contrast, "the lodestar create[s] an

unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and

compel[s] district courts to engage in gimlet-eyed review of line-item fee audits." *Id.* at 121.

### B.   The Reasonableness Of The Requested Fees Is Supported By This Circuit's Six-Factor *Goldberger* Test

The Second Circuit has articulated six factors that should be considered when

determining the reasonableness of a requested percentage to award as attorneys' fees: "(1) the

time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the

risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the

settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50. A review of these

factors support Class Counsel's fee request.

### 1.     Time And Labor Expended By Counsel

For over a year, Class Counsel has devoted 310.1 hours to investigating, litigating, and resolving this complex case.  *See* Fraietta Decl. ¶ 41; Declaration of Frank S. Hedin In Support Of Plaintiffs' Motion For Attorneys' Fees, Costs, Expenses, And Service Awards ("Hedin Decl.") ¶ 20.  Class Counsel has been working on this case since December 2018, when it began investigating Maxim's alleged violations of the PPPA.  *See* Fraietta Decl. ¶ 4; Hedin Decl. ¶ 12.  The pre-suit investigation was extensive and involved in-depth research into a number of data sharing practices, including data appending, subscriber list rental, and use of data cooperatives. *Id.*  Class Counsel also drafted the Complaint and the First Amended Complaint, and engaged in formal and informal discovery, as well as motion practice.  Fraietta Decl. ¶¶ 5-21.

Further, Class Counsel expended considerable time and labor on the settlement process as well.  From the outset of the case, the Parties engaged in direct communication, and as part of their obligation under Fed. R. Civ. P. 26, discussed the prospect of resolution.  *Id.* ¶ 22.  To that end, on January 9, 2020, counsel for the Parties met in-person for approximately 1 hour to discuss potential resolution.  *Id.* ¶ 23.  During the meeting, counsel for the Parties exchanged informal discovery, including on issues such as the size and scope of the putative class, and details of Plaintiffs' subscription histories.  *Id.*  While counsel engaged in good faith negotiations, which at all times were at arms'-length, they failed to reach an agreement that day. *Id.*  However, the Parties agreed that further negotiations would be beneficial, and agreed to continue their negotiations over the coming weeks.  *Id.*  Over the next few months, the Parties continued to engage in settlement negotiations, and on March 22, 2020, finally reached agreement on all material terms of the Settlement and executed a term sheet.  *Id.* ¶ 26.

Since that time, Class Counsel has:  (1) prepared and finalized the formal Class Action Settlement Agreement; (2) prepared Plaintiffs' Motion For Preliminary Approval; (3) worked

with the Settlement Administrator, JND Legal Administration ("JND"), to carry out the Court-ordered notice plan and monitor settlement claims and any other issues that may arise; and (4) fielded calls from Settlement Class Members and assisted them with their requests. *Id.* ¶¶ 30-31, 37-39.

Thus, the work performed by Class Counsel to date has been comprehensive, complex, and wide ranging.  This factor supports the requested fee award.

### 2.     Magnitude And Complexity Of The Litigation

"[C]lass actions have a well deserved reputation as being most complex." *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal citation and quotations omitted).  This case was no exception, both factually and legally.  This case involved multiple layers of factual complexity, much of which was obscured at the outset due to Maxim's alleged concealment of its data sharing practices from consumers.  As a result, this required extensive preliminary investigation into Maxim's business practices, its methods of data collection, aggregation, and sharing, and the nature of its relationships with various third-party data companies.  Fraietta Decl. ¶ 4; Hedin Decl. ¶ 12.

Moreover, absent the Settlement, the success of Maxim's various defenses in this case could deprive the Plaintiffs and the Settlement Class Members of any potential relief whatsoever. Maxim is represented by highly experienced attorneys who have made clear that absent a settlement, they were prepared to continue their vigorous defense of this case.  Plaintiffs and Class Counsel are also aware that Maxim would continue to challenge liability, as well as assert a number of defenses.  Maxim had indicated that it would continue to assert numerous defenses on the merits.  More specifically, Plaintiffs are aware that Maxim would continue to assert that the PPPA does not prohibit the disclosure of the magazine subscriptions information at issue (because the third-party recipients of the disclosures are Maxim's agents), that Maxim also

provided appropriate notice of its practices, and that the PPPA does not apply to subscriptions

that were not sold by Maxim "at retail," as is required to come under the scope of the statute.

Plaintiffs and Class Counsel are also aware that Maxim would oppose class certification

vigorously, and that Maxim would prepare a competent defense at trial.  Looking beyond trial,

Plaintiffs are also keenly aware that Maxim could appeal the merits of any adverse decision, and

that in light of the statutory damages in play it would argue – in both the trial and appellate

courts – for a reduction of damages based on due process concerns.  *Id.* ¶ 35.

In the end, because this case involved complex factual and legal questions under the

PPPA – its application to Maxim and its alleged disclosures, the constitutionality of the

underlying statute, and defining the scope of what it means to sell a magazine "at retail," an issue

which was decided unfavorably for Plaintiffs by the Sixth Circuit in *Coulter-Owens v. Time Inc.*,

695 F. App'x 117, 124 (6th Cir. 2017) – the magnitude and complexity of the litigation further

supports the requested fee award.

### 3.      The Risk Of Litigation

This factor recognizes the risk of non-payment in cases prosecuted on a contingency

basis where claims are not successful, which can justify higher fees.  *See, e.g., In re Marsh

ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment

in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully

overcome that risk."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008)

(noting risk of non-payment in cases brought on contingency basis).  "It is well settled that class

actions are notoriously complex and difficult to litigate."  *Shapiro v. JPMorgan Chase 7 Co.*,

2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) (internal citation omitted).  This case

presented a substantial risk of non-payment for Class Counsel.

For over one year, Class Counsel invested significant time, effort, and resources to the litigation without any compensation.  Fraietta Decl. ¶ 41.  Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a fact-intensive investigation of Maxim's practices, engaged in informal and formal discovery, and engaged in motion practice.  *Id.* ¶¶ 4-21.  Class Counsel also engaged in a lengthy arms'-length negotiation process.  *Id.* ¶¶ 22-27.  Class Counsel fronted this investment of time and resources, despite the significant risk of nonpayment inherent in this case, and in doing so, had to forego other work, including hourly non-contingent matters, and other class action cases.  *Id.* ¶¶ 4-27, 43.  And given the defenses mounted by Maxim, the risk of establishing class-wide liability was substantial.  *Id.*  ¶¶ 4-27, 35.

Moreover, Class Counsel faced highly qualified defense counsel, who regularly defend complex class action cases.  *Id.* ¶ 35.

The fact that Class Counsel undertook this representation, despite the significant risk of nonpayment, supports the requested fee award.

### 4.    The Quality Of Representation

Class action litigation presents unique challenges and – by an exceptional settlement – Class Counsel proved that they have the ability and resources to litigate this case zealously and effectively.  In addition, Class Counsel are well-respected attorneys with significant experience litigating consumer class actions of similar size, scope, and complexity.  *Id.* ¶¶ 50-52, Ex. M, Hedin Decl. ¶¶ 6-11, Ex. A.  Bursor & Fisher, P.A. also served as Class Counsel in six cases brought under the PPPA, and settled all six.  Fraietta Decl. ¶ 51.

Moreover, Class Counsel has been recognized by courts across the country for their expertise.  *See* Firm Resume of Bursor & Fisher, P.A., Marchese Decl. Ex. M; Firm Resume of Hedin Hall LLP, Hedin Decl. Ex. A; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) ("Bursor & Fisher, P.A., are class action lawyers who have

experience litigating consumer claims. … The firm has been appointed class counsel in dozens

of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries

in five class action jury trials since 2008."); *Luczak v. Nat'l Beverage Corp.*, 2018 WL 9847842,

at *2 (S.D. Fla. Oct. 12, 2018) ("Hedin Hall LLP has extensive experience in class actions[.]").

Furthermore, "[t]he quality of the opposition should be taken into consideration in

assessing the quality of the plaintiffs' counsel's performance." *In re MetLife Demutalization

Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010). Class Counsel achieved an exceptional result

in this case while facing well-resourced and experienced defense counsel. *See Marsh ERISA

Litig.*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts

further proves the caliber of representation that was necessary to achieve the Settlement.").

Class Counsel litigated this case efficiently, effectively, and civilly. The excellent result

is a function of the high quality of that work, which supports the requested fee award.

### 5.    The Requested Fee In Relation To The Settlement

Class Counsel seeks attorneys' fees, costs, and expenses of one-third of the $228,165

cash Settlement Fund. As aforementioned, courts in this Circuit routinely approve fee requests

for one-third of a common fund. *See supra* cases cited in Argument § I. Moreover, the

requested fees of one-third of the settlement fund is an equal percentage to that approved by

other courts in this District in PPPA cases. *See Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-

01812-KMK, ECF No. 87 (S.D.N.Y. Feb. 1, 2018) (awarding one-third of $8.225 million

settlement fund resolving plaintiff's PPPA claim that paid approximately $41 per claimant). And

it is a lesser percentage than courts have approved in the Eastern District of Michigan. *See

Perlin v. Time Inc.*, No. 16-cv-10635-GCS, ECF No. 55 (E.D. Mich. Oct. 15, 2018) (awarding

40% of $7.4 million settlement fund resolving plaintiff's PPPA claim that paid between $25-$50

per claimant); *Kinder v. Meredith Corp.*, No. 14-cv-11284-TLL, ECF No. 81 (E.D. Mich. May

18, 2016) (awarding 35% of $7.5 million settlement fund resolving plaintiff's PPPA claim that paid approximately $50 per claimant).  This factor thus supports the requested fee award.

### 6.     Public Policy Considerations

The final *Goldberger* factor is public policy.  "Skilled counsel must be incentivized to pursue complex and risky claims [that protect the public on a contingency basis]."  *Shapiro*, 2014 WL 1224666, at *24.  As such, reasonable fee awards must be provided in order to ensure that attorneys are incentivized to litigate class actions, which serve as private enforcement tools to police defendants who engage in misconduct.  *See id.*  "Attorneys who fill the private attorney general role must be adequately compensated for their efforts," otherwise the public risks an absence of a "remedy because attorneys would be unwilling to take on the risk."  *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *7 (E.D.N.Y. Nov. 20, 2012) (citing *Goldberger*, 209 F.3d at 51).  Further, when individual class members seek a relatively small amount of statutory damages, "economic reality dictates that [their] suit proceed as a class action or not at all."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex litigation that is necessary to protect the privacy of consumers' personal reading choices.  In fact, class action litigation in this area is the most realistic means of safeguarding the privacy of readers under the PPPA, especially because consumers are generally unaware that their privacy rights are being violated by these data sharing practices (here, Plaintiffs alleged that Maxim secretly disclosed its customers' personal reading information).  *See also TMBI* Hearing Tr. at 17:23-25 ("Here the private Attorney General role is something that does merit compensation and this case is another example of that.").  Thus, the alternative to a class action in this case would have been no enforcement at all, and Maxim's allegedly unlawful conduct would have continued unabated.  This factor thus supports the requested fee award.

**C.     The Requested Attorneys' Fees Are Also Reasonable Under A Lodestar Cross-Check**

A lodestar cross-check further supports the requested fee.  Courts applying the lodestar method generally apply a multiplier to take into account the contingent nature of the fee, the risks of non-payment, the quality of representation, and the results achieved.  *See Wal–Mart Stores, Inc.*, 396 F.3d at 121.  Where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  *Goldberger*, 209 F.3d at 50; *see also Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (noting the "need for exact [billing] records [is] not imperative" where the lodestar is used as a "mere cross-check").

To calculate lodestar, counsel's reasonable hours expended on the litigation are multiplied by counsel's reasonable rates.  *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 264 (E.D.N.Y. 2009).  The resulting figure may be adjusted at the court's discretion by a multiplier, taking into account various equitable factors.  *See Parker*, 631 F. Supp. 2d at 264; *Shapiro*, 2014 WL 1224666, at *24 ("Additionally, under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.") (internal quotations and citations omitted).

The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum*, 465 U.S. at 895; *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115-116 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'") (alteration in original and citation

omitted).  Here, the hourly rates used by Class Counsel are comparable to rates charged by

attorneys with similar experience, skill, and reputation, for similar services in the New York

legal market.  *See* Fraietta Decl. ¶¶ 45-49; Hedin Decl. ¶¶ 22-25.[1]

     The hours worked, lodestar fee, and expenses for both of the firms representing the

Settlement Class are set forth in the declarations of Mr. Fraietta and Mr. Hedin, submitted

herewith.  They can be summarized as follows:

| Summary Of Class Counsel's Time, Lodestar And Expenses | | | |
|---|---|---|---|
| **Firm** | **Hours** | **Lodestar** | **Expenses** |
| Bursor & Fisher, P.A. | 226.2 | $154,135.00 | $1,795.89 |
| Hedin Hall LLP | 83.9 | $58,730.00 | $200.00 |
| **Total** | **310.1** | **$212,865.00** | **$1,995.89** |

     In total, through September 18, 2020, Class Counsel billed 310.1 hours, which at their

hourly rates amounts to a lodestar of $212,865.  *See* Fraietta Decl. ¶ 41; Hedin Decl. ¶ 20.

Therefore, the requested fee award reflects a negative multiplier on Class Counsel's regular

hourly rates.

     In sum, the requested attorneys' fees are also reasonable under the optional lodestar

cross-check.

## II.  THE REQUESTED SERVICE AWARDS REFLECT MR. HUFFORD'S AND MR. WISBISKI'S ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE APPROVED

     Service awards are common in class action cases and serve to "compensate plaintiffs for

---

[1]  The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (recognizing "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise"); *LeBlanc-Sternberg v. Fletcher,* 143 F. 3d 748, 764 (2d Cir. 1998) ("The lodestar should be based on 'prevailing market rates' … and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.") (citation omitted).

the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff[s]." *Reyes*, 2011 WL 4599822, at *9.  Service awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take. *Massiah*, 2012 WL 5874655, at *8.

Here, the participation of Mr. Hufford and Mr. Wisbiski was critical to the ultimate success of the case. *See* Fraietta Decl. ¶¶ 54-56.  Mr. Hufford and Mr. Wisbiski each spent approximately 30 hours protecting the interests of the class through their involvement in this case. *See* Declaration of Patrick Hufford In Support Of Plaintiffs' Motion For Final Approval Of Class Action Settlement And Motion For Attorneys' Fees, Costs, Expenses, And Service Awards ("Hufford Decl.") ¶ 10; Declaration of John Wisbiski In Support Of Plaintiffs' Motion For Final Approval Of Class Action Settlement And Motion For Attorneys' Fees, Costs, Expenses, And Service Awards ("Wisbiski Decl.") ¶ 10.  Mr. Hufford and Mr. Wisbiski assisted Class Counsel in investigating their claims, by detailing their magazine subscription histories and aiding in drafting the First Class Action Complaint. *Id.* ¶¶ 3-4.  During the course of this litigation, Mr. Hufford and Mr. Wisbiski kept in regular contact with her lawyers to receive updates on the progress of the case and to discuss strategy. *Id.* ¶ 5.  Further, Mr. Hufford and Mr. Wisbiski searched for and produced documents in discovery, and were both prepared to testify at deposition and trial, if necessary. *Id.* ¶ 6.  Finally, Mr. Hufford and Mr. Wisbiski were actively consulted during the settlement process. *Id.* ¶ 7.

On these facts, the $5,000 service awards are fair and reasonable.  Indeed, Judge Karas approved a service award of $5,000 for the Class Representative in *Taylor* under similar facts. *TMBI* Hearing Tr. at 15:10-19.  And the requested $5,000 awards are well within the range of service awards approved by courts in this District. *See, e.g.*, *In re Currency Conversion Fee Antirust Litig.*, 263 F.R.D. 110, 131 (S.D.N.Y. Oct. 22, 2009); *Dornberger v. Metro. Life Ins.*

*Co.*, 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (noting case law supports payments of between $2,500 and $85,000).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) approve attorneys' fees, costs, and expenses in the amount of one-third of the settlement fund, or $76,055, (2) grant Mr. Hufford and Mr. Wisbiski a service award of $5,000 each in recognition of their efforts on behalf of the class, and (3) award such other and further relief as the Court deems reasonable and just.

Dated:  September 25, 2020

Respectfully submitted,

By:   */s/ Philip L. Fraietta*
          Philip L. Fraietta

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  jmarchese@bursor.com
              pfraietta@bursor.com

**HEDIN HALL LLP**
Frank S. Hedin*
1395 Brickell Avenue, Suite 1140
Miami, FL 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
Email: fhedin@hedinhall.com
*Admitted *Pro Hac Vice*

*Class Counsel*